IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE ATI TECHNOLOGIES INC.            :            CLASS ACTION
SECURITIES LITIGATION                  :            NO. 05-4414


O'NEILL, J.                                                AUGUST 8, 2007

MEMORANDUM

In an Order dated June 29, 2006, I consolidated four class actions filed in this Court and

any other similar actions filed in or transferred into this District against defendants ATI

Technologies Inc., Kwok Yuen Ho, David Orton, Patrick Crowley and Terry Nickerson for

alleged violations of the securities laws regarding the sale of securities by individual defendants

and disclosures of the company's financial information.  Plaintiffs, purchasers of ATI securities

on the NASDAQ and Toronto Stock Exchange ("TSX") during the period from October 7, 2004

through June 23, 2005, filed a consolidated class action complaint on September 8, 2006.

Before me now are defendants' motion to dismiss the consolidated class action

complaint, plaintiffs' response, and defendants' reply thereto.

FACTS

Defendant ATI designs, manufactures and supplies graphics, video and multimedia

products for desktop and notebook personal computers, digital televisions, cellular telephones

and video game consoles.  Individual defendants Ho, Orton, Crowley and Nickerson are,

respectively, the Chairman of ATI's Board of Directors, ATI's President and Chief Executive

Officer, ATI's Chief Financial Officer and ATI's former Chief Executive Officer.

In their consolidated class action complaint, plaintiffs allege that this case arises out of a

series of material misrepresentations made by defendants throughout the class period about one

of defendant ATI's products, a three-dimensional graphics visual processor unit ("VPU")[1] known

as R520.  According to plaintiffs, defendants represented to analysts, investors and the market

that it would release R520 by June 2005 to keep pace with its "only real competitor" in the global

personal computer market, Nvidia Corporation.  Nvidia Corporation intended to introduce a

counterpart product to R520, the GEFORCE 7800 SLI in the same time frame.

The Private Securities Litigation Reform Act ("PSLRA") requires plaintiffs in securities

fraud actions to "specify each statement alleged to have been misleading" and "the reason or

reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Plaintiffs specify in their

consolidated amended class action complaint sixteen allegedly misleading statements made by

defendants or other parties during the class period:

> (1)    In its Form 6-K/Quarterly Report for the fourth quarter of fiscal year 2004, filed
>
> with the SEC on October 7, 2004, ATI stated:
>
>> Our corporate strategy continues to produce returns, said David Orton,
>> ATI's Chief Executive Officer.  Our PCI Express desktop product line-up
>> is the most competitive product family on the market, resulting in
>> tremendous customer acceptance.  In addition, the growth rate of our
>> digital consumer business continues to outpace the market, based on ATI's
>> innovative products for all use in cell phones and digital televisions.
>> . . . .
>> We expect our leadership in graphics and multimedia technologies for
>> both digital consumer products and PCI Express-based PCs to continue
>> driving growth for ATI in fiscal 2005.  As a result, ATI currently expects
>> revenue for the first quarter of fiscal 2005 to be in the range of $600 to
>> $640 million.  Gross margin, as a percentage of revenues, is expected to be
>> between 33 and 34%.

---

[1]VPUs are semiconductor chips that increase the speed and improve the quality of images
displayed on computer monitors and also enhance screen resolution and color definition.

(2)     On October 7, 2004, during a conference call with analysts and investors,

defendant Ho stated:

Our annual results were equally as strong . . . . Net income for the year is
up nearly 6 times from fiscal 2003. [This] performance illustrates that our
strategy is working and working well.  And our strategy begins with
technology leadership.  We continue to lead our industry in products and
technology.  We [leverage] this leadership into growth opportunities by
anticipating and meeting critical industry [inflection] points.

(3)     On October 7, 2004, during that same conference call, defendant Orton stated:

At ATI innovation and technology leadership are at the core of our strategy
and the key to our vision and future success.  And this quarter is a perfect
proof point for this strategy.  We hit a critical inflection point with the
[PCI Express] transition.

(4)     On October 29, 2004, Goldman Sachs reported:

INCREMENTALLY POSITIVE NEWS ON DESKTOP DISCRETE
ROADMAP. [ATI] revealed that it planes to launch its next generation
architecture, the R5xx series, in 1H 2005.  This is an incremental positive
vs. our expectations, as until now, [ATI] was ambiguous on whether it
would launch in 1H or 2H 2005 . . . . [T]he company has already taped out
the new chips on 90nm at TSMC, potentially giving it a cost advantage in
H205.

(5)     On November 8, 2004, Deutsche Bank Securities analysts Ben Lynch and

Christopher Avery stated:

Over the past 2 [years] ATI has outgrown [Nvidia] by +90% cumulatively
. . . . However, a strong product and execution for [Nvidia's] NV5X
architecture, or a correspondingly weak R5xx offering from ATI, could
reverse this at least for discrete GFX processors (75% of ATI's revenues,
including boards).

(6)     On November 10, 2004, Rick Hegberg, ATI's Executive Vice-President of

Worldwide Sales, stated:

So as you have seen over the last several quarters, we have been

3

very successful in growing our revenue; and we anticipate continuing that
in fiscal 2005 . . . . [W]e believe we are going to be able to deliver some
stronger earnings to shareholders.

So the key thing that we really focus on is what we call our
dashboard [i.e., senior management internal report].  These are the key
metrics that really drive our day-to-day business.  So first is products and
technologies.  We are very rigorous in schedules in terms of how we roll
products out, hitting scheduled dates because , in the PC space, it's very,
very critical to ramp a product when processors ramp.  So we are very
conscious of specific schedules . . . [i]t is very critical in this industry to hit
schedules.
. . . .

The second thing we look at is the market and the customers.  In
the PC space, there is very limited [sic] customers.  So it is critical as we
bring these new products out we have to deliver on design wins. . . . If you
go back a year ago, when we rolled out our PCI Express products, we said
we wanted to have a significant market share with that, which meant we
had [to] be very successful in winning design wins which we were.
. . . .

The third piece or metric is our financial dashboard and that is,
obviously, meeting and exceeding our revenue objectives, meeting and
exceeding our margin objectives, and meeting and exceeding our EPS
objectives.  It is ingrained in the Company right now, that we will exceed
and meet or exceed these objectives that we do now put out there.

(7)     Around November 19, 2004, defendants represented to the market during a series

of ATI investor meetings that the "next-generation" R520 test chips had hit their

"milestones" to date and that the new VPU would be due for commercial release

by no later than the end of June 2005.

(8)     On November 19, 2004, Deutsche Bank analysts stated: "Next architecture

remains competitive: In [the first half of calendar 2005], both [Nvidia] and ATI

release their next gen architectures, NV5X and [R520]."

(9)     On November 30, 2004, Goldman Sachs stated that the "next key [pricing]

catalyst" for ATI's stock would be the rollout of the R520 VPU ahead of Nvidia's

4

competing offering, the GEFORCE 7800 SLI.

(10)    In its Form 6-K/Quarterly Report for fiscal year 2004, filed with the SEC on

December 20, 2004, ATI stated:

Our record year . . . is the result of momentum that comes from executing
on a strategy that is anchored by our commitment to product and
technology leadership.
. . . .
Our record year . . . is evidence we are on course to maintain our
leadership.
. . . .
Our record year . . . is just the beginning . . . because this revolution that
thrives on innovation and because innovation – timed to meet the needs of
our customers and consumers – is our strength.
. . . .
[Our FY04 financial] results are more than just a record of ATI's past –
they are a glimpse into our future, as the full impact of our growth
initiatives and strategic investments continue to accrive in fiscal 2005 and
beyond.
. . . .
Our PCI express solutions are the most popular and robust in the PC
industry.

(11)    In its Form 6-K/Quarterly Report for the first quarter of fiscal year 2005, filed

with the SEC on December 20, 2004, ATI stated:

We continue to demonstrate our technology and industry leadership
through innovation, execution and customer focus, said David Orton,
ATI's Chief Executive Officer.  This has translated into the sustained
financial and operational performance we have seen over the last several
quarters.  Looking ahead, we believe we will continue to grow our
business by helping consumers to create, connect and communicate in new
ways – whether it's bringing 3D and camera features to mobile phones or
high definition content to home PCs.
. . . .
[W]e expect our leadership in graphics and multimedia technologies to
continue to drive growth for ATI. . . . We expect gross margin in the
second quarter to be approximately the same as the first quarter of fiscal
2005 as improved PC margins should offset seasonal weakness of our
consumer products and game console businesses . . . .

5

(12)     On December 21, 2004, during a conference call with analysts and investors,

defendant Orton stated:

> Success in our business depends on product and technology leadership . . .
> that has enabled us to hit these key inflection points [and] has translated
> into both top line and bottom line results.
> . . . .
> In the past 12 months we hit key inflection points such as the 130
> nanometer [] transition back last winter, the move to 110 nanometer and
> the critical move to PCI Express and we are fast approaching the transition
> to 90 nanometer . . . so stay tuned to ATI . . . .

(13)     Later in that same conference call, Orton had this exchange with Dennis Fong, an

analyst from Dlouhy Merchant group:

> Fong:   [Y]ou talked about a prototype expense moving from this quarter
>              to the next quarter and is that going to impact any type of product
>              roll-outs in terms of meeting certain design win[s] . . . or anything
>              like that?
> Orton:  No. . . .

(14)     In its Form 6-K/Quarterly Report for the second quarter of fiscal year 2005, filed

with the SEC on March 24, 2005, ATI stated:

> With the best solutions for visual applications in the PC and digital
> consumer markets, we're excited about our prospects for the rest of 2005
> and beyond. . . . Gross margin percentage [for Q3 FY05] is expected to
> remain approximately the same [i.e., 34.2%] as the second quarter
> operating expenses, excluding stock-based compensation costs, are
> expected to increase by about 5% sequentially [to about $138 million] as
> we continue to invest in research and development to create a foundation
> for long-term growth.  Looking into the fourth quarter, we expect . . . the
> PC business to be better than seasonal due to growth in integrated and new
> products.

(15)     On March 24, 2005, on a conference call for analysts and investors, Orton stated,

"Over the next few months, we expect to launch our next generation VPUs based

on the new 90nm technology.  So stay tuned and watch the next major leap in

digital realism come to reality."

(16)    During that same conference call, Orton also had the following exchange with

Goldman Sachs analyst Andrew Root:

Root:   Hi thanks very much.  Dave, can you give us a quick update on the
        R520 transition – any visibility you can provide on how important
        it's going to be to growing above seasonal in the August quarter?

Orton:  Not a lot more than I gave in the [opening] comments.  As you
        know we are driving hard on next generation platforms.  And one
        of the code names out there that we tend to use in public is the
        R520 . . . And so what I'd just say, there is – stay tuned for over the
        next few quarters or the next few months and we'll give you a lot
        more insight into that, okay?

Plaintiffs contend that as a result of defendants' misrepresentations about R520, ATI's

securities traded at artificially inflated levels on the NASDAQ and TSX during the class period,

reaching highs of approximately $20.39 per share (United States) on the NASDAQ and $24.82

(Canadian) on the TSX.  During that time, the individual defendants collectively sold over 2.3

common shares of their ATI holdings, realizing over $45 million in proceeds.  The complaint

alleges that, as the individuals holding the most senior positions at ATI with the responsibility of

directing and managing ATI's business and financial reporting, the individual defendants knew

or recklessly disregarded non-public facts concerning the failings of R520 which in turn rendered

their statements during the class period misleading.  Specifically, plaintiffs allege that the above

statements numbered 1-16 were materially false or misleading because of the following adverse

facts:

(1)    Defendants knew or recklessly disregarded that R520 had severe product

       development and design problems by June 2004, when none of ATI's key original

       equipment manufacturer customers agreed to advance-purchase R520 upon

7

receiving engineering samples in Spring 2004 due to problems with clock speed, voltage and system compatibility.  By December 2004, ATI was forced to begin a series of five "re-spins"[2] of R520.  Plaintiffs contend that the first re-spin of R520 made it impossible for ATI to introduce R520 commercially by June 2005, and each re-spin further delayed introduction.  The clock speed, voltage and system compatibility problems remained unresolved through the end of the class period.

(2)     Defendants knew or recklessly disregarded that ATI would lose significant market share to Nvidia and already was losing most of the high-end PC design wins to Nvidia in 2004 and 2005 because R520 could not be commercially introduced by June 2005.

(3)     Defendants knew or recklessly disregarded that due to the required re-spins ATI's operating expenses materially increased far more than 5% sequentially during the third quarter of fiscal year 2005, putting downward pressure on its earnings.

(4)     Defendants knew or recklessly disregarded that there was no basis in fact for defendants' representations that ATI would launch R520 by June 2005, that its growth would continue to accrue into fiscal year 2005, or that its gross margins would be approximately 34% for the third quarter of fiscal year 2005.

(5)     Defendants, due to their positions within ATI, had access to material non-public information concerning ATI's day-to-day business and thus has the ability and

---

[2]A "re-spin" is a process by which design flaws are investigated.  Companies will send additional test chips to silicon foundries in Asia.  According to plaintiffs, a single re-spin of a 3D graphics VPU can delay commercial introduction by months and increase engineering costs by as much as 20%.

opportunity to correct or prevent the issuance of misleading press releases and representations.

On June 6, 2005, defendants issued a press release announcing ATI had missed its financial projections for the third quarter of fiscal year 2005.  On June 7, 2005, ATI's shares closed at $13 per share.  On June 22, 2005, Nvidia formally announced the introduction of its GEFORCE 7800 SLI.  The next day, on June 23, 2005, defendants issued a press release announcing that ATI had experienced a $445,000 loss in the third quarter of the fiscal year of 2005.  During a conference call held on that day, defendant Orton disclosed that ATI would not be able to deliver R520 on schedule:

> We have led the industry with the X800 series of products and are now poised to do this again with the R520 series.  Yes we've taken a hit on schedule, we are now back on track, so stay tuned as we get prepared to take the definition of performance leadership to a whole new level. . . . So in the case of the 520 we have seen some delays. . . . So from a standpoint of Q4 revenues, there's, and the overall caution around the 520, there's no impact from customer ramps.  It's basically, it's a complex product that we had originally targeted to launch in the early summer and now we're targeting late summer, and so the push out of that in the quarter from a revenue standpoint is a significant part of the revenue adjustment down for Q4

On June 23, 2005, ATI's stock closed at $11.29 per share.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiffs' obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964-65 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." <u>Id.</u> (citations omitted).  A well-pleaded complaint may proceed even if it appears "that recovery is very remote and unlikely." <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).

Because it sounds in fraud, however, a private cause of action under the securities laws "requires more than mere reference to the conventional standard applicable to motions under Rule 12(b)(6)." <u>In re Rockefeller Center Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 215 (3d Cir. 2002).  The PSLRA, 15 U.S.C. §§ 78u-4 <u>et seq.</u>, and Federal Rule of Civil Procedure 9(b) impose a heightened pleading standard for complaints in securities fraud actions.  <u>See In re Advanta Corp. Sec. Litig.</u>, 180 F.3d 525, 531 (3d Cir. 1999); <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1417 (3d Cir. 1997).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," Fed. R. Civ. P. 9(b), and "[t]his particularity requirement has been rigorously applied in securities fraud cases." <u>In re Burlington</u>, 114 F.3d at 1417.  The heightened pleading standard "requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue." <u>In re Rockefeller</u>, 311 F.3d at 217 (quotations and citations omitted).

DISCUSSION

I.      <u>Plaintiffs' Section 10(b) and Rule 10b-5 Claim</u>

In their consolidated amended class action complaint, plaintiffs allege that defendants

violated the securities laws by making a series of material misrepresentations throughout the

relevant class period regarding their product R520, a semi-conductor chip.  Section 10(b) of the

Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 together

create "liability for false and misleading statements or omissions of material fact that affect

trading on the secondary market."  In re Burlington, 114 F.3d at 1417.  Section 10(b) provides, in

pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce or of the mails, or of any facility of any
> national securities exchange–
> . . . .
> (b) To use or employ, in connection with the purchase or sale of any security
> registered on a national securities exchange or any security not so registered . . .
> any manipulative or deceptive device or contrivance in contravention of such rules
> and regulations as the Commission may prescribe as necessary or appropriate in
> the public interest or for the protection of investors.

15 U.S.C. § 78j.  Promulgated thereunder, Rule 10b-5 makes it unlawful:

> for any person, directly or indirectly, by the use of any means or instrumentality of
> interstate commerce, or of the mails or of any facility of any national securities
> exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made, in light of the circumstances
> under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person, in connection with the purchase or
> sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) and Rule 10b-5, plaintiffs must allege that defendants: (1)

made a specific misstatement or omission of material fact; (2) with scienter, i.e., a wrongful state

of mind; (3) in connection with the purchase or sale of a security; (4) upon which plaintiffs

reasonably relied; and (5) that plaintiffs' reliance was the proximate cause of (6) economic loss. In re ATI Techs. Sec. Litig., 216 F. Supp. 2d 418, 427 (E.D. Pa. 2002); see also Dura Pharm. v. Broudo, 544 U.S. 336, 341-42 (2005) (separating a private securities action into six basic elements: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation).

In their motion to dismiss, defendants argue that plaintiffs' complaint fails to identify any actionable statement by defendants concerning R520, fails to allege scienter, and fails to allege a causal connection between the alleged material misrepresentations and plaintiffs' damages.

A.      Actionable Statement

To state a valid securities fraud claim under Rule 10b-5, a plaintiff must first establish that defendant "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1417; see also In re Rockefeller, 311 F.3d at 211 (asserting that Rule 10b-5 "explicitly require[s] a well-pleaded allegation that the purported misrepresentations or omissions at issue were material"). A fact is "material" only where "there [is] a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the public. TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976). "[A]ccurate report[ing] of past successes does not contain an implicit representation that the trend is going to continue" and therefore does not constitute a material misrepresentation. In re Burlington, 114 F.3d at 1432; see also In re Advanta, 180 F.3d at 538-39 (holding that accurate reports of earnings and past financial successes are not material misrepresentations). Further, "[m]aterial representations must be contrasted with statements of subjective analysis or

extrapolations, such as opinions, motives and intentions, or general statements of optimism, which "'constitute no more than "puffery" and are understood by reasonable investors as such.'" EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872 (3d Cir. 2000), quoting In re Advanta, 180 F.3d at 538 (Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material . . . .").

"[N]on-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information," such as "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000). "There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading." In re Aetna, Inc. Sec. Litig., 34 F. Supp. 2d 935, 948 (E.D. Pa. 1999). However, with respect to a company's duties vis-a-vis statements of third parties such as analysts, a company cannot be held liable for a third party's statements unless it expressly adopts or endorses that statement. "Though securities laws require [a company] to speak truthfully to investors; they do not require [it] to police statements made by third parties for inaccuracies, even if the third party attributes the statement to [it]." Raab v. Gen. Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993); see also Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir. 1980) (finding no liability absent allegations that company "sufficiently entangled itself with the analysts' forecasts to render those predictions 'attributable to it'"). Liability only attaches when "the company expressly adopted or endorsed the analyst's report." In re Burlington, 114 F.3d at 1428. The Court of Appeals reasoned that "[w]hen a high-ranking corporate officer explicitly expresses agreement with an outside forecast, that is close, if not the same, to the

officer's making the forecast."  Id. at 1429 (finding "no reason why adopting an analyst's forecast by reference should insulate an officer from liability where making the same forecast would not").

As stated above, the PSLRA imposes a heightened pleading standard for complaints in securities fraud actions.  In addition, the PSLRA established a safe harbor for "forward-looking statements."[3]  15 U.S.C. § 78u-5(c).  Under the safe harbor provision, forward-looking statements are immunized if and to the extent that:

(A) the forward-looking statement is–

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement–

_____

[3]The term "forward-looking statement" means:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity, was–

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).  "[A] defendant will be immune from liability if any one of [this provision's] criteria is met."  In re ATI, 216 F. Supp. 2d at 429.

As stated above, plaintiffs specify in their consolidated amended class action complaint sixteen allegedly misleading statements made by defendants or other parties during the class period.  I will discuss each of these statements in turn.

1.     Statement 1 – Form 6-K dated October 7, 2004

Statement 1 is not actionable.  The first quoted paragraph is merely a reporting of past trends and has nothing to do with the development of R520.  The second quoted paragraph merely notes ATI's general expectations regarding its future earnings, i.e., it is a statement of extrapolation and opinion which constitutes no more than "puffery" and thus is not material.  Further, this statement contains no reference to R520 or any expected release date for R520.

2.     Statements 2 and 3 – conference call on October 7, 2004

Statements 2 and 3 are not actionable.  With respect to Statement 2, plaintiffs offer nothing to suggest that the initial sentence – a statement of past performance – is inaccurate, and accurate reporting of past successes does not contain an implicit representation that the trend is going to continue.  The remainder of Statement 2 is a vague and general statement of optimism and therefore does not constitute a material misrepresentation.  Further, like Statement 1,

Statement 2 contains no reference to R520 or any expected release date for R520.

Statement 3, like Statements 1 and 2, contains only a vague statement of puffery and contains no reference to R520 or any expected release date for R520.  Though Orton vaguely stated, "We hit a critical inflection point with the [PCI Express] transition," there is nothing here to indicate that this general statement would lead investors or the public to understand specifically that R520 would be released in June 2005.

3.      Statements 4, 5, 8 and 9 – Goldman Sachs and Deutsche Bank reports

Statements 4, 5, 8 and 9 are not actionable.  Nowhere does the complaint plead with any specificity that ATI or any individual defendant adopted or endorsed any statement made by Goldman Sachs or Deutsche Bank contained in the complaint.  Though the complaint asserts that the Goldman Sachs report of October 29, 2004 was issued after presentations at ATI's "Analyst Day" and that the Deutsche Bank report of November 19, 2004 was based on an investor meeting, the complaint fails to state who allegedly supplied this information to the analysts, how it was supplied, or how ATI could have controlled the content of the statement.  Because no adoption or endorsement is alleged and the securities laws do not require ATI "to police statements made by third parties for inaccuracies," I find that any alleged inaccuracies in the analysts' reports are not actionable.

4.      Statement 6 – statement of Rick Hegberg on November 10, 2004

Statement 6 is not actionable.  This statement describes ATI's expectations, motives and intentions, and it is at most a general statement of optimism which constitutes no more than puffery.

5.      Statement 7 – defendants' representations around November 19, 2004

16

Statement 7 is not actionable.  Plaintiffs allege that defendants made representations to the market during a series of ATI investor meetings "around November 19, 2004" that R520 test chips had hit their milestones and would be due for commercial release no later than June 2005. However, this allegation clearly does not satisfy the presently applicable heightened pleading standard, which requires that plaintiffs support their allegations with all of the essential background that would accompany the first paragraph of any newspaper story.  With respect to this alleged representations, the specifics of who, when, where and how are entirely absent from the complaint.

6.      Statements 10 and 11 – Form 6-K dated December 20, 2004

Statements 10 and 11 are not actionable.  Like Statement 1, these statements report past trends and make no specific mention of the development of R520.  To the extent that these statements look to the future, e.g., provide ATI's general expectations regarding its future earnings and ATI's place in the industry, they are statements of extrapolation and general statements of optimism which constitute no more than "puffery" and thus are not material.

7.      Statements 12 and 13 – conference call on December 21, 2004

Statements 12 and 13 are not actionable.  Again, these statements report past events, and reporting of past events does not contain an implicit representation that any trend is going to continue.  During the conference call, Orton stated that ATI was fast-approaching a transition to 90 nanometer and new lower power technologies and that investors should "stay tuned;" this statement, Statement 12, makes no specific mention of the development of R520 and certainly does not indicate that R520 would be ready for commercial introduction by June 2005.

Plaintiffs' complaint seeks to treat Statement 13 as a express denial that R520 was going

17

to be late to market.  I disagree.  The question concerns the shifting of a prototype expense

unidentified by the complaint from one quarter to another, and Orton simply responds that this

will not impact product roll-outs.  This statement makes no mention of R520.  Further, the

complaint does not ever indicate where defendants represented when R520 would be released.

Therefore plaintiffs cannot demonstrate product roll-out was impacted in any way by the shifting

of a prototype expense.

8.     Statement 14 – Form 6-K dated March 24, 2005

        Statement 14 is not actionable.  The quoted paragraph is merely a statement of

extrapolation of data from the previous quarter and general optimism about the rest of the fiscal

year.  Thus it constitutes no more than "puffery" and is not material.  Further, as with statements

from other Form 6-Ks cited by the complaint, this statement contains no reference to R520 or any

expected release date for R520.

9.     Statements 15 and 16 - conference call on March 24, 2005

        Statements 15 and 16 are not actionable.  In Statement 15, Orton notes, "Over the next

few months, we expect to launch our next generation VPUs based on the 90nm technology.  So

stay tuned and watch the next major leap in digital realism come to reality."  Regardless of what

specific product Orton is discussing, this quoted language is a statement of motives and

intentions and thus is distinguishable from a material representation under the holding of the

Court of Appeals in EP Medsystems.  Orton states nothing more than an expectation that a

product will be launched at some point over the "next few months."  Plaintiffs cannot rely on this

vague statement to plead sufficiently that defendants represented that R520 would be introduced

specifically by June 2005.

18

Though Statement 16 is the only alleged statement in the complaint in which defendants specifically address R520, Orton merely advises listeners to "stay tuned over the next few quarters or the next few months" to gain more insight on the R520 transition.  Therefore Statement 16 contains no material information whatsoever; it simply implores listeners to "stay tuned."

For the foregoing reasons, I find that plaintiffs have not pleaded adequately that defendants made an actionable specific misstatement or omission of material fact.  The foundation of plaintiffs' consolidated amended class action complaint is the allegation that "[d]efendants repeatedly told investors that ATI would introduce R520 for commercial release by June 2005," but the complaint fails to identify any such statement attributable to defendants. Because plaintiffs fail to satisfy the first element of their cause of action under § 10(b) and Rule 10b-5, I will dismiss plaintiffs' § 10(b) and Rule 10b-5 claim.

B.      Scienter and Loss Causation

Because I find that plaintiffs fail to satisfy the first element of their cause of action under § 10(b) and Rule 10b-5, I will dismiss plaintiffs' § 10(b) and Rule 10b-5 claims for failure to state a claim.  Therefore I need not address the remaining bases for defendants' motion to dismiss.

II.      Plaintiffs' Section 20(a) Claims

Section 20(a) of the Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under [Section 10(b)] shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Under Section 20(a), plaintiffs "must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws."  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284 (3d Cir. 2006).  The Court of Appeals has "observed that [t]he text of the statute plainly requires the plaintiff to prove not only that one person controlled another person, but also that the controlled person is liable under the Act.  If no controlled person is liable, there can be no controlling person liability."  Id. at 285, quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 279 (3d Cir. 1992) ("[D]ismissal of the § 10(b) claim against [defendant corporation] made it impossibel to hold the individual defendants liable under § 20(a).") (quotation marks and citation omitted).

In their consolidated amended class action complaint, plaintiffs allege that the individual defendants were "controlling persons" under the meaning of § 20(a) as they had direct and supervisory involvement with the day-to-day operations of ATI.  Because plaintiffs fail to plead adequately a § 10(b) claim, no defendants can be held liable under § 20(a).  I therefore will dismiss plaintiffs' § 20(a) claims.

An appropriate Order follows.

20

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE ATI TECHNOLOGIES INC.        :           CLASS ACTION
SECURITIES LITIGATION              :           NO. 05-4414

## ORDER

AND NOW, this 8th day of August 2007, upon consideration of defendants' motion to dismiss, plaintiffs' response, and defendants' reply thereto, and for the reasons stated in the accompanying memorandum, it is hereby ORDERED that defendants' motion to dismiss is GRANTED.  Plaintiffs' consolidated amended class action complaint is DISMISSED.


s/Thomas N. O'Neill, Jr.
THOMAS N. O'NEILL, JR., J.